IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH M. ALVAREZ,<br><br>        Petitioner,<br><br>   v.<br><br>McDONALD, Warden,<br><br>        Respondent. | No. C 09-1771 WHA (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

This is a habeas case filed pro se by a state prisoner pursuant to 28 U.S.C. 2254. Respondent was ordered to show cause why the writ should not be granted based on the three claims in the petition. Respondent has filed an answer and a memorandum of points and authorities in support of it. Petitioner filed a traverse. For the reasons set forth below, the petition is **DENIED**.

## STATEMENT

In 2005, a jury in Santa Clara County Superior Court convicted petitioner of two counts of forced oral copulation (Cal. Pen. Code § 288a(c)(2)), one count of forcible rape (Cal. Pen. Code § 261(a)(2)), one count of inflicting corporal injury on a cohabitant (Cal. Pen. Code § 273.5(a)), and one count of making a criminal threat (Cal. Pen. Code § 422). The trial court sentenced him to forty-three years and four months in prison (Exh. 1 at 374).

On February 1, 2008, the California Court of Appeal affirmed the conviction and sentence (Exh. 9). The California Supreme Court denied petitioner's petition for review on April

1  30, 2008 (Exh. 11). Petitioner filed the instant federal habeas petition on April 22, 2009.

2  The following description of the evidence presented at trial is from the opinion of the
3  California Court of Appeal (Exh. 9 at 3-13). In March 2005, petitioner and Tracy Doe lived
4  together in a house in San Jose. They shared a bedroom with Tracy's two sons, L.D., who was
5  two years old, and C.D., who was four.

6  On March 7, 2005, petitioner came home at 10:00 p.m., and Tracy confronted him about
7  another woman. Tracy's children were present throughout their argument and fight, which
8  lasted all night and into the following morning. At around 2:00 a.m., petitioner ordered Tracy to
9  get into bed with him, and she complied out of fear that he would hit her. He forced her to orally
10 copulate him, slapped her, grabbed her by the hair, and threatened her until she complied.
11 Tracy's children were in the bedroom but asleep at the time. At around 4:00 a.m., Tracy finally
12 fell asleep on the floor with her two-year-old son, L.D. At around 7:00 a.m., petitioner woke her
13 up and ordered her to get back into bed, telling her she "had a job to finish," referring to oral
14 copulation.

15 Tracy tried to leave the house at around 8:00 a.m., but petitioner followed her, grabbed
16 her, and "forcefully" made her go back into their bedroom by blocking her and pushing her with
17 his body. Then he shut and locked the door and choked her with his hands until she could not
18 breathe. He also threatened to hit her with his fist.

19 After this incident, Tracy once again attempted to leave with her children. Petitioner
20 followed Tracy up the street, spat at her, yelled at her, and told her to sit down because he
21 wanted to speak with her. Petitioner then took L.D. back in the house, and Tracy returned to the
22 house. She picked L.D. up, and petitioner pushed her into the bedroom with L.D. still in her
23 arms.. Petitioner shut the bedroom door, locked it, and threw a glass of soda on the floor where
24 it smashed into small pieces. Petitioner then shoved Tracy onto the bed, telling her she "had a
25 job to finish."

26 Petitioner straddled Tracy with his legs across her chest and ordered her to "grab" and
27 "suck his dick." He slapped her, telling her she would have a "shiner" and pulled her hair.
28 Tracy orally copulated petitioner out of fear. Later, while they were on the bed, petitioner

1  ordered Tracy to take off her clothes. Tracy took off her shorts and shirt and petitioner ripped
2  her bra off, breaking it. Then petitioner restrained Tracy, pried her legs open with his hand, and
3  started having sex with her. Tracy made it clear to petitioner that she did not want to have sex
4  with him. Tracy's children were in the room throughout these events.

5        After petitioner forced Tracy to have sex with him, she went to the bathroom and called
6  her sister. Petitioner followed Tracy to the bathroom and told her "to get back in the fucking
7  room." When Tracy returned to the bedroom, petitioner told her to come into the closet. There,
8  he grabbed her by her hair and neck, threatened to hit her or kick her in the head, and made her
9  orally copulate him so violently she could not breathe and vomited.

10        Tracy continually told petitioner that she wished to leave. Petitioner responded to
11  Tracy's pleas by telling her she could leave if she orally copulated him or if she did his laundry
12  for him. Petitioner also told Tracy that if she left he would kill her by stabbing her in the neck
13  with the knife he had in his pocket, and he also threatened to harm her daughter.

14        Finally, between 2:30 and 4:00 p.m., Tracy's sister Tammy and her husband Sam arrived
15  at the house. Tracy later told Tammy that petitioner had raped her, beaten her, and refused to let
16  her leave. Tracy also later told Sam that petitioner raped her. Tammy saw red marks on Tracy's
17  neck from where petitioner choked her. Petitioner came out and threatened to stab her in the
18  neck with his knife if she did not get back in the house.

19        Tracy left with Tammy and Sam and went to a safe-house in Pleasanton. On March 9,
20  2005, she reported the events of March 7th through 8th and her probation status to the San Jose
21  police. While at the police station, Tracy had bruises on her arms, sides, and inside of her thighs.
22  The police photographed only the bruises on her arms.

23        On March 14, 2005, while still in Pleasanton, Tracy received a midnight phone call from
24  petitioner. He wanted to know why the police were "after him." Petitioner called back four or
25  five times and left threatening messages on the answering machine. Tracy called the police. An
26  officer came and took Tracy to the Pleasanton Police Department where she made a written
27  report. San Jose police arrested petitioner that day. He admitted that he and Tracy argued about
28  another woman and that he "might have put his hands on [Tracy's] neck" or "grabbed her right

3

wrist and pulled it behind her head." However, petitioner asserted that he took these actions in self-defense. Petitioner also said that he had brought Tracy's son L.D. inside the house out of concern for L.D.'s safety.

## ANALYSIS

**A.   STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority under the first clause of Section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of 'Supreme Court authority'" under the second clause of Section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340. This presumption is not altered by the

4

fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and convincing evidence to overcome Section 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Ibid.*

Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

### B. ISSUES PRESENTED

As grounds for federal habeas relief, petitioner asserts that: (1) admission of evidence of prior acts of domestic violence under California Evidence Code Section 1109 violated his due process rights, (2) the prosecutor committed misconduct by diluting the definition of reasonable doubt and by referring to typical behavior of victims of domestic violence during closing argument, (3) he received ineffective assistance of counsel on various grounds.

#### 1. Admission of Testimony of Prior Domestic Violence

Petitioner argues that California Evidence Code Section 1109 violates due process on its face because it allows the admission of propensity evidence. Petitioner also claims that the trial court abused its discretion and violated due process in admitting evidence of prior domestic violence testimony in this case.

California Evidence Code Section 1109(a)(1) provides in relevant part: "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

The California Court of Appeal described the evidence of petitioner's prior acts of domestic violence as follows:

> Stephanie Szoke testified at trial that she was living with defendant in August 1997. She called police because he had assaulted her during the course of an argument, which had begun because Stephanie had wanted to take a cab to a friend's house and defendant did not want her to leave or to

5

spend money on a cab. Stephanie's then two-and-a-half-year-old daughter was present during the argument in which defendant was calling Stephanie offensive names. Defendant at one point got up and hit Stephanie, punching her twice in the face. The force of the blows knocked her back and to the ground and she was unconscious for a few seconds. After coming to, Stephanie got up and tried to get out the front door with her daughter but defendant held her up against the door and choked her. Stephanie's daughter asked defendant to stop. After he did, Stephanie grabbed the phone and her daughter and went out the door, passing by defendant. Defendant told her that she wasn't leaving and that "if he had to drag [her] ass back in and beat [her] ass, he would." Defendant also threatened that if "anything ever became of this" incident, he would kill her. But she left anyway and got in the cab that she had previously called. Stephanie called 911 and sought victim counseling. Police responded and Stephanie was taken by ambulance to the hospital.

Defendant was Richael Vallone's boyfriend in July 1999 and they were living together. Richael spent the night at a girlfriend's house, near where defendant found her the next morning walking down the street. He was in his car and he said to Richael, in front of her friend and her friend's neighbors, "[D]id [you] have fun, 'you fucking bitch, last night,'" referring to the fact that she hadn't come home the night before. They began to argue and defendant got out of his car and proceeded to try to take Richael's car keys away from her. She would't let him have the keys and she tried to walk away but he grabbed her by the hair, twisted her arm, and threw her into a tree, freeing up her keys. Richael suffered a scratch on the back of her neck and a scrape on her elbow. One of the neighbors called the police.

Defendant had dated Liza Speer for about seven months and they split up sometime before January 2001. But at that time, he was living with someone else and seeing Liza "on the side." Liza went to the home of some friends she had met through defendant on New Year's Day, 2001. Defendant was there when she arrived. They began to argue because defendant was upset that Liza was at "his" friends' home after they had broken up. He told Liza to go home and to "get the F out," using the "F word" and calling her "[t]he F bitch." Liza responded by calling him "a f'ing punk" for which he came from the living room over to the kitchen table where she was sitting with other people and "popped" her in the mouth. He also said, "'No one talks to me that way and gets away with it'" and that he would hit her again. "Wendy," who lived at the house, told defendant to leave since it was a "no violence house." He responded by saying, "'What the F are you going to do about it?'" One of the other people there then called the police.

When the police arrived, Liza did not want to talk to them because she was afraid defendant would hit her again, as he had done 10 to 20 times before. The police left but returned that evening to see if Liza would "press charges" and her friends convinced her to talk with an officer. She told the officer what had happened that day and of the injury to her lip as a result of defendant having hit her. She also told them that defendant had hit her before. He had left her with bruises on prior occasions but she had never reported these incidents to police because she was afraid for her own safety and that of her daughter. Defendant had previously told Liza that "he was going to cut [her daughter] up in little pieces" and "[Liza] would have to watch." Defendant had also called Liza's mother and in a

6

veiled threat said that he knew where she lived. Because of her fear of defendant, Liza at one point moved to Modesto to live with her parents. Liza also testified that she knew Shalan Slagle and that while Liza was dating defendant, he spent a lot of time with Shalan: "[I]t was to the extent that [Liza] was even accusing those two of being together."

The prosecution called Officer Binder under Section 1109, who testified that while observing Shalan Slagle from his car from 40 feet away in connection with an undercover narcotics investigation in April 2003, he saw her and defendant arguing and he saw Shalan try to take away defendant's cell phone. Defendant responded by placing his hand around her neck and pushing her away, which was followed by defendant getting very close to her face. Concerned for Shalan's safety, the officer and his partner got out of their car and approached Shalan and defendant, detaining them.  The jury was informed of counsel's factual stipulation that if Shalan herself were called as a witness, she would testify that defendant had never assaulted her.

(Exh. 9 at 21-24.)

### a. **Facial Challenge to Section 1109**

The United States Supreme Court has left open the question of whether admission of propensity evidence violates due process. *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5 (1991). Because the Supreme Court reserved this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right regarding the admission of propensity evidence is not "clearly established" as required by AEDPA. *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006).  Therefore, a state court's rejection of such a claim does not provide grounds for federal habeas relief.  *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008).

Furthermore, the Ninth Circuit has held that the analogous federal rule, Federal Rule of Evidence 414, which allows the admission of propensity evidence in sexual offense cases, does not violate due process because the evidence is still subject to the trial court's balancing test which provides meaningful review. *United States v. LeMay*, 260 F.3d 1018, 1031 (9th Cir. 2001).  As propensity evidence admitted under Section 1109 is similarly subject to a balancing test under California Evidence Code Section 352, Section 1109 does not violate due process on its face.

### b. **Admission of Evidence of Prior Domestic Violence -- Section 352**

Petitioner argues that the trial court abused its discretion in failing to exclude the evidence of his prior domestic violence under California Evidence Code Section 352.  This

7

1 argument does not provide grounds for habeas relief. A person in custody pursuant to the
2 judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is
3 in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C.
4 2254(a). The Supreme Court has repeatedly held that federal habeas writ is unavailable for
5 violations of state law or for alleged error in the interpretation or application of state law.
6 *Estelle*, 502 U.S. at 67-68. Even if the admission of the evidence of prior domestic violence
7 violated Section 352, this would be an error of state law that does not entitle petitioner to federal
8 habeas relief. *See, e.g., ibid* (state court's conclusion that admission of prior injury evidence was
9 incorrectly admitted pursuant to state law was deemed to be interpretation of state law that did
10 not provide grounds for federal habeas corpus relief).

### c. **Admission of Evidence of Prior Domestic Violence -- Due Process**

12 The admission of evidence is not subject to federal habeas review unless a specific
13 constitutional guarantee is violated or the error is of such magnitude that the result is a denial of
14 the fundamentally fair trial guaranteed by due process. *See Colley v. Sumner*, 784 F.2d 984, 990
15 (9th Cir. 1986). The failure to comply with state rules of evidence is neither a necessary not a
16 sufficient basis for granting federal habeas relief on due process grounds. *See Jammal v. Van de
17 Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). The due process inquiry in federal habeas review is
18 whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial
19 fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). However, only if
20 there are no permissible inferences that the jury may draw from the evidence can its admission
21 violate due process. *See Jammal*, 926 F.2d at 920.

22 Admission of the evidence of prior domestic violence did not render petitioner's trial
23 fundamentally unfair. As petitioner concedes, Section 1109 permits the introduction of
24 propensity evidence and the drawing of an inference of propensity by the jury (Pet. 3). The prior
25 acts testimony portrayed essentially the same pattern of conduct that petitioner displayed with
26 Tracy. In almost every case the victim and petitioner engaged in an argument where petitioner
27 hurled insults and epithets at the victim. The arguments then escalated into physical altercations
28 during which petitioner would not permit the victim to leave. Physical abuse involved choking,

8

1  hitting the victims in the face, and grabbing victims by the hair.  On several occasions the

2  arguing and physical abuse took place in front of other people, including small children.

3          Although it is true that none of the prior instances involved sexual abuse or were as long

4  and drawn out as Tracy's ordeal, these facts do not diminish the relevance and probative value of

5  the prior acts testimony.  The similarity of petitioner's conduct with each victim allowed the jury

6  to draw the permissible inference that Tracy testified truthfully and that petitioner did in fact

7  commit the charged offenses.

8           In addition, the risk of prejudice was mitigated by limiting instructions as to the proper

9  use of the evidence, which the jury is presumed to follow.  *See Aguilar  v.  Alexander*, 125  F.3d

10  815,  820 (9th Cir. 1997).  The jury was instructed under Section 1109 that if they found by a

11  preponderance of the evidence that petitioner had committed prior acts of domestic violence,

12  they could use this finding to infer that petitioner was likely to commit and did commit the

13  crimes for which he stood trial (Exh. 9 at 24).  The jury was also instructed that a finding that

14  petitioner committed prior acts of domestic violence was not by itself enough to prove beyond a

15  reasonable doubt that he committed the charged offenses (*ibid*).  The jury was further were

16  instructed that consideration of prior evidence of domestic violence could only be used for this

17  purpose (*ibid*).

18          Petitioner next argues that the prosecutor never established that Shalan and petitioner had

19  a "dating" relationship as required by Section 1109.  As an argument based on state law, this

20  does not provide grounds for habeas relief.  *See Estelle*, 502 U.S. at 67-68.  However, even if the

21  testimony regarding Shalan rendered petitioner's trial fundamentally unfair, it did not prejudice

22  him in any way.  Prejudice occurs when the error "had a substantial and injurious effect or

23  influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

24  The testimony concerning Shalan was not prejudicial because it was not a significant part of the

25  case against petitioner.  Testimony describing petitioner grabbing Shalan by the neck, pushing

26  her away, and then getting very close to her face was mild in comparison to the other evidence of

27  his domestic violence.  Stephanie Szoke testified that petitioner punched her in the face so hard

28  that she lost consciousness for a few seconds and that petitioner choked her in front of her two-

1  year-old child; Richael Vallone testified that petitioner twisted her arm behind her back and
2  threw her into a tree during an argument; Liza Speer testified that petitioner hit her in the mouth,
3  causing bleeding, and that he had threatened to "cut [her daughter] up into little pieces;" and
4  Tracy testified to over a day's worth of beatings and sexual assault in front of her children at the
5  hands of petitioner.  Moreover, the jury was informed of counsels' stipulation to the fact that if
6  Shalan were to testify, she would deny the altercation between her and petitioner ever occurred.
7  Shalan's unwillingness to implicate petitioner further weakened the evidence of her reported
8  abuse.
9       In sum, petitioner's due process rights were not violated by the admission of prior
10 instances of domestic violence under Section 1109.  Section 1109 does not violate due process
11 on its face, nor did the evidence admitted under Section 1109 at petitioner's trial render it
12 fundamentally unfair or prejudicial.  Petitioner cannot obtain habeas relief on these grounds.

13       **2.      Prosecutorial Misconduct**

14       Petitioner claims that the prosecutor made impermissible statements regarding facts not
15 in evidence in her discussion of Tracy behaving like a typical victim of domestic violence.
16 Petitioner also argues that the prosecutor committed misconduct by using evidence of prior
17 domestic violence for the improper purpose of showing victim propensity instead of petitioner's
18 propensity to commit domestic violence.  Petitioner further asserts that the prosecutor committed
19 misconduct by misstating the law on the burden of proof.

20            **a.      Comments on Behavior of Victims of Domestic Violence and Evidence of Prior Domestic Violence**

21       Petitioner's claims of prosecutorial misconduct with respect to the prosecutor's
22 references to typical behavior of victims of domestic violence and use of prior instances of
23 domestic violence to explain this behavior are procedurally defaulted.  Under California law,
24 claims of prosecutorial misconduct must be objected to at trial in order to be preserved upon
25 appeal.  *See People v. Fosselman*, 33 Cal. 3d 572, 580-81 (1983).  A petitioner who fails to
26 observe a state's "contemporaneous objection" rules may not challenge the constitutionality of
27 the conviction in federal court.  *See Engle v. Isaac*, 456 U.S. 107, 129 (1982).  "A federal
28 claimant's procedural default precludes federal habeas review, like direct review . . . if the last

10

1  state court rendering a judgment in the case rests its judgment on the procedural default." *Harris*
2  *v. Reed*, 489 U.S. 255, 262 (1989).  The Ninth Circuit has recognized and applied the California
3  contemporaneous objection rule in affirming the denial of a federal petition on grounds of
4  procedural default where there was a complete failure to object at trial. *See Inthavong v.*
5  *Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th
6  Cir. 2004); *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999).

7     Here, petitioner failed to object to the prosecutor's statements regarding the behavior of
8  victims of domestic violence and evidence of prior domestic violence at trial.  The state court
9  held that this failure to object  resulted in petitioner forfeiting these claims on appeal (Exh. 9 at
10 36).  Thus, petitioner cannot now raise these claims in his federal habeas petition.  The fact that
11 the state court alternatively went on to reject the merits of petitioner's contentions does not
12 preclude a finding of procedural default on these claims. *See Harris*, 489 U.S. at 264 n. 10.

### b. Prosecutor's Description of the Burden of Proof

14    Petitioner claims that the prosecutor committed misconduct by misstating the burden of
15 proof.  A defendant's due process rights are violated when a prosecutor's misconduct renders a
16 trial "fundamentally unfair." *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Under
17 *Darden*, a federal court must determine whether the prosecutor's remarks were improper, and if
18 so, whether the improper conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d
19 1101, 1112 (9th Cir. 2005).  The fairness of a petitioner's trial may be measured by considering
20 "(1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the
21 trial court gave a curative instruction; (3) the weight of the evidence against the accused." *Id.* at
22 1115; *Darden*, 477 U.S. at 181-82.  The first factor, whether the prosecutor misstated or
23 manipulated the evidence is not applicable to petitioner's claim because the prosecutor's
24 comments on the burden of proof did not relate to the evidence.

25    The California Court of Appeal described the prosecutor's characterization of the burden
26 of proof during closing argument as follows:

> With regard to the burden of proof, the jury was instructed that reasonable doubt is defined as "not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and

11

> consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." Defense counsel emphasized that instruction in closing argument and urged the jury to focus on all the evidence, "the whole picture," not just on what the prosecutor highlighted.
>
> In rebuttal, the prosecutor said, "Beyond a reasonable doubt means that I've put on evidence of each element, and that you believe that evidence, you feel comfortable with it. That's all there is." Defense counsel objected on the basis that the prosecutor was misstating the law but the court overruled the objection noting that it was "argument" and further admonished the jury to "follow [the court's] instruction on what the law is." The prosecutor continued, "You can read the instruction for reasonable doubt, and it's difficult to understand, it's not quantifiable. I can't tell you where on the bar it fits. But what I can tell you is that you feel in your heart that that's what happened."
>
> Defense counsel again objected on the basis that the prosecutor was misstating the law, and the court again overruled the objection. Outside the presence of the jury, defense counsel restated his objection to the prosecutor's "interpretation of reasonable doubt instruction." The court again stated its view that the prosecutor's statements constituted argument, but that the jury instructions controlled, as the court had told the jury.

(Exh. 9 at 32-33.)

The prosecutor's remarks regarding the meaning of "beyond a reasonable doubt" were not improper. As the trial judge observed, the prosecutor's discussion of jurors feeling "comfortable with the verdict" and feeling " in [their] heart that that's what happened" appears to have been argument concerning the meaning of the phrase "abiding conviction" in the jury instruction (Ex. 2 at 456). Such an interpretation of "abiding conviction" is reasonable and does not dilute the burden of proof. It urges the juror to be completely certain that they are returning a verdict that leaves them without a doubt as to its correctness.

Additionally, the prosecutor mitigated any potential impropriety by telling the jury to read the instruction. As the California Court of Appeal noted, the prosecutor's description of the burden of proof in combination with her suggestion to the jurors that they read the instruction itself conveyed to the jurors that they had to "feel in their hearts" the state had proved the crimes in accordance with the proper standard of proof (Exh. 9 at 39-40).

Even if the prosecutor's remarks were improper, petitioner's trial was still fundamentally fair. For one, a prosecutor's mischaracterization of a jury instruction is less likely to render a trial fundamentally unfair than if the trial court issues the instruction erroneously:

12

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court.

*Boyde v. California*, 494 U.S. 370, 384-85 (1989) (citations omitted).

Furthermore, the trial court issued a curative instruction. After the prosecutor discussed the meaning of "beyond a reasonable doubt" and defense counsel objected, the trial court immediately admonished the jury that the prosecutor's statements were argument and the jury needed to follow the court's instruction on the law. As jurors are presumed to follow the court's instructions absent extraordinary circumstances, *see Francis v. Franklin*, 471 U.S. 307, 324 n. 9 (1985), the prosecutor's characterizations of the burden of proof presumably did not affect the jury's decision.

In sum, the prosecutor did not commit misconduct in commenting on Tracy's behavior as a victim of domestic violence, in using evidence of prior domestic violence to explain Tracy's behavior, and in arguing the meaning of "beyond a reasonable doubt." Petitioner cannot obtain habeas relief on this claim.

### 3. Ineffective Assistance of Counsel

Petitioner contends that he received ineffective assistance of counsel because his attorney failed to object to the admission of prior evidence of domestic violence on the ground that it was cumulative, failed to object to evidence concerning Shalan Slagle on the basis that there was no showing of a requisite domestic relationship under Section 1109(d)(3), and failed to object to the prosecutor's statements regarding behavior of typical victims of domestic violence. Petitioner also contends that the trial court abused its discretion in denying his motion for a new trial based on another ineffective assistance of counsel claim alleging that his attorney failed to investigate alibi witnesses, adequately cross-examine prosecution witnesses, and call certain witnesses to the stand.

In order to prevail on his ineffective assistance of counsel claims, petitioner must

13

establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). In determining whether counsel's performance was deficient, the relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689.

Second, petitioner must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Ibid.* A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *See id.* at 697. Furthermore, trial counsel cannot have been ineffective for failing to raise a meritless motion. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005).

### a. **Failure to Object to Evidence of Prior Domestic Violence as Cumulative**

The California Court of Appeal reasonably rejected petitioner's claim that counsel was ineffective for failing to object to the evidence of prior domestic violence as cumulative (Exh. 9 at 43). The prior victim testimony served to bolster different details in Tracy's testimony. Stephanie Szoke's testimony described petitioner as choking her in front of her young child, punching her in the face, and not permitting her to leave. Tracy testified that petitioner choked her and slapped her in the face in the presence of her children, and that he repeatedly kept her from leaving the house. Richael Vallone testified that petitioner grabbed her by the hair and twisted her arm when she would not give him her car keys during an argument. Tracy testified that petitioner grabbed her by the hair when he forced her to orally copulate him, and petitioner told the police that he put Tracy's wrist behind her head to restrain her. Liza Speer testified that petitioner hit her in the face and caused her nose to bleed, and that petitioner had once threatened

14

her daughter and mother. Tracy testified that petitioner had previously hit her in the face with his hand and her nose started bleeding, and that petitioner threatened to harm her daughter (Exh.2 at 70,126). While aspects of this testimony overlapped, each piece of Stephanie Szoke, Richael Vallone, and Liza Speer's testimony also added new information that was similar to Tracy's account and was therefore probative of her credibility. Therefore, counsel was not deficient for failing to object to this testimony as cumulative.

The Shalan Slagle evidence concerning petitioner's abuse could be viewed as cumulative of testimony given by the other prior victims of domestic violence. However, counsel's failure to object to it as cumulative did not prejudice petitioner. As the state court observed and as previously discussed, the evidence of what petitioner did to Shalan Slagle was the least violent of all the incidents of domestic violence. The jury was also informed that Shalan would deny the altercation took place if she were to testify, diminishing the probability that the jury believed this testimony or used it to draw the inference of propensity. The rest of the evidence in the case also strongly pointed to petitioner's guilt. As such, there is not a reasonable probability that but for the admission of this testimony, the outcome of petitioner's trial would have been different.

### b. **Failure to Object to Shalan Slagle Evidence**

Petitioner claims that his trial counsel was ineffective for failing to object to the admission of the Shalan Slagle testimony on the basis that there was no showing of a "relationship" between her and petitioner within the meaning of Section 1109(d)(3). The state court agreed with petitioner that this constituted deficient performance under *Strickland* (Exh. 9 at 43). However, the state court went on to hold that counsel's deficient performance did not prejudice petitioner (*id*. at 43-44). The state court's application of *Strickland* was objectively reasonable. For the reasons discussed above, the admission of testimony regarding Shalan Slagle did not prejudice petitioner.

### c. **Failure to Object to Prosecutor's Statements About Victim Behavior**

The California Court of Appeal reasonably rejected petitioner's argument that his counsel was ineffective for failing to object to the prosecutor's references in closing argument to typical behavior of victims of domestic violence (Exh. 9 at 44-45). The California Court of Appeal

15

described the prosecutor's comments regarding victim behavior as follows:

> In closing argument, the prosecutor argued without objection that Tracy was "a domestic violence victim. And she's not going to go spreading around to everybody what's going on with her. And how do we know that that's how domestic violence victims act? Well, because they're afraid, they don't call 911. They're afraid, when the police come, they don't talk. They're afraid, they say that these crimes didn't happen." Noting the code that Rick and Melissa had set up to ascertain whether Tracy needed help, the prosecutor asked, "Why do you do that? Because she's a domestic violence victim and you're afraid of what he's doing to her. You set up a code to try to protect her."
>
> The prosecutor further argued that Tracy had put up with defendant's behavior and didn't leave because she was a domestic violence victim: "Now, one of the things that you may be thinking about is why didn't Tracy leave[.] Why didn't she get out of that house? And I want you to think about that, and I want you to think about it in relation to how some of those other women behaved. And I don't want you to think of Tracy as the average preschool teacher, the average nurse, [or] someone that you know. Because the truth is that most people you know-you hope-would have been out of this relationship the time they got popped in the nose. Most people you know wouldn't tolerate that, is what you hope and is what you think. [P] And when you imagine how a woman would react, you think, 'Oh God, I can't imagine that they would put up with this.' But you have evidence of other women who did. And you have evidence that [it's] not a completely abnormal reaction to stay there."
>
> The defense made no objection to these statements.

(Exh. 9 at 31-32.)

Despite the fact that the prosecution did not have an expert witness testify on the behavior of victims of domestic violence, the facts which the prosecutor used to argue that Tracy behaved like a typical victim of domestic violence were in evidence. The prosecutor drew parallels between the behavior of prior victims and Tracy's behavior to make the point that victims of domestic violence display a particular reluctance to report abuse. Because this information was in evidence, an objection by petitioner's trial counsel would likely have been meritless, and it was reasonable for him not to make it.

Petitioner further argues that evidence of prior domestic violence can only be used to prove a defendant's propensity, not a victim's. This Court agrees with the state court that petitioner's distinction is artificial (*id*. at 36). As the state court reasoned, the prosecutor had to prove that petitioner did in fact commit the prior acts of domestic violence in order for the jury to be able to consider them (*ibid*.). Proof of these prior bad acts manifested itself in the form of

16

1  prior victim testimony (*ibid*.). To find that petitioner committed the prior bad acts, the jury had
2  to believe the victims (*ibid*.). The victims' behavior in response to petitioner's violence bore on
3  their credibility as witnesses, and consequently, the soundness of the proof of petitioner's prior
4  bad acts (*id*. at 36-37). Thus, evidence of the victim's reactions to petitioner's abuse was
5  relevant to whether petitioner perpetrated the abuse in the first place, an issue which the jury had
6  to resolve under Section 1109. As such, the prosecutor's argument with respect to this evidence
7  and what it reveals about the behavior of victims of domestic violence was proper, and counsel
8  was not deficient in failing to object to it.

### d. **Failure to Admonish as to Burden of Proof**

Petitioner's trial counsel was not ineffective for failing to request that the jury be admonished a second time regarding the prosecutor's description of the burden of proof. Petitioner's counsel objected to the prosecutor's statements two times in front of the jury and once again outside of the jury's presence. The trial judge admonished the jury after the first time defense counsel objected to the prosecutor's argument as to the burden of proof. The trial judge specifically told the jury that the prosecutor's statements constituted argument and that the jury had to follow the instructions given to it by the court. A request by trial counsel for a further admonition after his second objection would not have given the petitioner any additional benefit. The trial judge had already admonished the jury, and jurors are presumed to follow the court's instructions. *Francis*, 471 U.S. at 324 n. 9. The record does not suggest that this admonition left the jury's consciousness merely because the prosecutor reiterated her comments on the burden of proof. Thus, it was reasonable for trial counsel to not request further admonition.

### e. **Denial of Motion for a New Trial**

The state courts reasonably rejected petitioner's claims of ineffective assistance of counsel in his motion for a new trial. In the motion, he claimed that counsel's decisions as to witnesses and cross-examination were deficient. The trial court held an evidentiary hearing during which petitioner's trial counsel explained his decisions on these matters.

First, petitioner complained that counsel failed to call alibi witnesses. At the evidentiary hearing, counsel explained that he tried to verify specific dates with them, but upon

17

investigation, none of the alibi witnesses helped with the purported alibi (Exh. 2 at 497-98). Because the alibi witnesses would not have been helpful, it was reasonable for trial counsel to not call them to the stand.

Next, petitioner complains his attorney did not call Officer Nagle to testify about Tracy's calm demeanor and the lack of pictures of bruises on her thighs. Even assuming that Officer Nagle would testify as petitioner suggests[1], petitioner was not prejudiced by the absence of this testimony. That Tracy's demeanor was calm when she spoke to Officer Nagle on March 9, 2005, does not contradict her status as a sexual assault victim. In addition, by the time Tracy spoke to Officer Nagle, she had already spent some time away from petitioner and could have regained her composure, or she could have been in shock. Moreover, counsel cross-examined Tracy on her calm demeanor when speaking to her stepmother immediately after petitioner slapped her and choked her (Exh. 2 at 184). Officer Nagle's impression as to Tracy's demeanor a day after the events of March 7th and 8th would have been much less probative and would have added little to the defense case. Similarly, an explanation for the lack of pictures of bruises on Tracy's thighs would not have helped petitioner's case. Photographs of bruises on Tracy's arms were admitted into evidence, bolstering the credibility of Tracy's testimony, and the absence of evidence of bruises on her thighs does not show that a sexual assault did not occur.

Petitioner also complains that his attorney failed to adequately cross-examine Liza Speer. Trial counsel's allegedly defective cross-examination of Liza Speer did not prejudice petitioner. Even if petitioner's allegations that proper cross-examination of Liza Speer would have shown that she still supported and lived with petitioner after his crimes against her are true, there is no reasonable probability that the result of the trial would have been different. Two other victims testified to petitioner's prior acts of domestic violence. Stephanie Szoke's testimony was far more damaging than Speer's in that she described petitioner choking her in front of children. Richael Vallone testified to petitioner throwing her into a tree in front of other people. Most importantly, Speer's testimony was far less inflammatory that Tracy's own

---

[1] A portion of trial counsel's explanation of his decisions, including his decision not to call Officer Nagle and his cross-examination of various witnesses, is not included in the transcripts submitted by respondent (*see* Ex. 2 at 492-93). Such testimony is not necessary to the resolution of petitioner's claims, however.

account about more than a day's worth of sexual abuse in front of her children.

Finally, petitioner also complains that his attorney failed to cross-examine Tracy, Rick Hansen, Melissa Paxton, and police officers regarding inconsistencies in their testimony. This was neither unreasonable nor prejudicial. During closing argument, trial counsel used the inconsistencies in their testimony to attack their credibility (Exh. 9 at 422-41). Had he cross-examined them about the inconsistencies testimony, they would have had an opportunity to explain the inconsistencies and mitigate the damage to their credibility. As a result, trial counsel did not act deficiently in this regard.

In sum, petitioner's trial counsel was not ineffective for failing to object to the admission of prior evidence of domestic violence and the prosecutor's statements regarding typical behavior of victims of domestic violence. Petitioner's trial counsel was also not ineffective for failing to investigate alibi witnesses, adequately cross-examine prosecution witnesses, and call certain witnesses to the stand. Therefore, state court's rejection of petitioner's ineffective assistance of counsel claims was neither contrary to, nor an unreasonable application of, federal law.

## CONCLUSION

The petition for a writ of habeas corpus is **DENIED**.

Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this court's denial of his claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

The clerk shall enter judgment close the file.

**IT IS SO ORDERED.**

Dated: February  16 , 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

19

G:\PRO-SE\WHA\HC.09\ALVAREZ1771.RUL.wpd